First case on today's docket is cause number 24-10031, Turner v. BNSF Railway. Petitioner, appellant, ready to proceed. Mr. Hanson? That's me. Good afternoon and may it please the court. Adam Hanson on behalf of appellant Tracy Turner. For 15 years, Mr. Turner did his job safely. Despite being born with a color vision impairment, Turner never missed a green or red signal on the job. He passed BNSF's color vision test every three years and was licensed to perform as a conductor. Did he take the previous tests with his glasses? With the chromatic lenses? The complaint is silent on that point, your honor. Isn't it really relevant? I don't think so. I mean, it could be probative, certainly. I mean, I take the thrust of your complaint to be number one, we can't go through the FRA system because they don't have the ability to tell us whether and to what extent we should be able to use the glasses, and number two, he's been doing this fine, his vision hasn't degraded, but we don't know if he was taking the previous tests with his glasses. We can find out, we can use the discovery process to do that. Do we know if he took the test with his glasses that he would pass? Or put differently, has the test changed in some way? The test has changed. I mean, the crux of Mr. Turner's allegation is number one, the test no longer reflected what he actually needs to see in the field. Because he can't wear his glasses or for some other reason? For some other reason. I'm confident saying that. I mean, this goes to the heart of the case. The FRA regulations provide no substance on what a field test should entail. It could be five miles, it could be 50 feet. And so his allegation is that, you know, the reason that railroads are afforded such extraordinary discretion by the FRA is because it depends on the situation on the ground, it depends on different routes. And he was able to perform his job safely and the test didn't reflect that. If I may, the district court erred, of course, in two respects. First, with respect to preclusion. And second, with respect to Mr. Turner being qualified. Start with preclusion. The Supreme Court has made clear, most recently in Palm Wonderful, that courts must give effect to both bodies of law when two laws touch on the same subject as they do here. Doing so is not difficult. The FRA regulations provide railroads with an extraordinary amount of latitude to conduct these tests. The ADA, at most, constrains some of that latitude while allowing employees like Mr. Turner to receive a reasonable accommodation and ensure that the test is job-related and consistent with business necessity. The court, of course, directs us to look at traditional tools of statutory interpretation. We've gone through that in our brief. Nothing in the text, the intratextual clues, the structure, or the purpose of the FRSA and the regulations compared to the ADA convinces any congressional intent for the FRSA to preclude ADA claims. There's certainly no explicit textual provision, and we've highlighted half a dozen what we might think of as intratextual clues that there's no preclusion. There's, of course, a fairly robust preemption provision that bars states from interfering with what the FRA is doing. And, of course, the Supreme Court found that particularly notable in Palm Wonderful to say, well, that convinces at least some congressional intent that Congress didn't intend to preclude other federal laws. The structure, scope, and the purpose of the laws are just different. The FRA rules and the FRSA deals with railroad safety. The ADA deals with discrimination. Counsel, is it correct that he did not, your client, did not pursue the FRA's administrative procedures until the final step of that? That is correct. Okay, and what impact would that have on his ability to bring an ADA claim? It has no impact for a couple of reasons. So, first, there's preclusion. Second, there's the qualified question, and it touches on both of these. So, first, with preclusion, there's simply nothing in the text of the statute that indicates that this dispute resolution provision was supposed to serve as a stand-in for the ADA. To the contrary, the review provision is incredibly circumspect. It looks for substantial evidence and, essentially, abuse of discretion, compliance with the legal standards. And the FRA, and we've quoted these decisions in our reply brief, has absolutely no authority to consider these sorts of ADA claims. And so Mr. Turner didn't try, but others have, and it's essentially, it's a fool's errand. It doesn't do anything that's relevant for the ADA claims. With respect, I do want to answer the court's question with respect to qualified. It's largely similar there. The FRA and its dispute resolution procedures is, again, not empowered by Congress, not empowered by the Department of Transportation to resolve these sorts of claims. And so lumping this in with, like, for example, Railway Labor Act cases with an arbitration or Federal Arbitration Act cases where the question is really who decides, it has no purchase here because the FRA can't decide. Would it have any impact on whether he's a qualified individual under the ADA? It wouldn't, and that's true for a couple of reasons. And I really like this point because I think it illustrates the heart of the argument here. So just focus in for a second on the issue of reasonable accommodations. So the FRA regulations neither require nor prohibit reasonable accommodations. They permit them. So from the perspective of the FRA, either advancing a reasonable accommodation or withholding one would be acceptable. The ADA, of course, it's a different matter. The ADA, subject to coverage and so forth, requires generally reasonable accommodations as long as they're not an undue burden, as long as they don't pose a direct threat. And the reasonable accommodation that you want is the chromatic lenses. Chromatic lenses, but also just a modification to the field test itself to make sure that it reflects what Mr. Turner sees in his area on his routes. Is Mr. Turner allowed to wear the chromatic lenses while he's operating a train? The record is silent as to that point, and I don't want to hazard an answer. You know, from his perspective, that could be part of the reasonable accommodation, and, of course, that would be subject to discovery and analysis under the ADA. Have you read the provision Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors that appears in 49 CFR parts 240 and 242? We have, and I'm familiar... I don't want to preempt the question, but, I mean, there's discussion in there about the chromatic lenses, obviously. So help me understand it. I mean, it seems to say, number one, you can't use chromatic lenses on the initial test. Number two, there's new data that I gather the FRA is taking from the FDA about particular kinds of chromatic lenses, and the best practice given to the railway is don't use them. Don't allow them, not for the field test. No... Sorry, go ahead. Please. No dispute about point one. That's right in the regulation. Point two, it's a little fuzzier, and, of course, these are sub-regulatory materials. This is evolving science, and so, look, I mean, this, I think, for purposes of today, at the judgment of the pleadings, it supports us, right? Because this would be reviewed for business necessity. This would be reviewed for direct threat, which direct threat goes to exactly the point that Your Honor just made. What is the latest science? And, look, I mean, BNSF may well win this case. On the ADA, we're not here to decide that. We're sort of here to decide whether the courthouse door is open. And so I take all that for granted, and that's a burden that Mr. Turner is going to have to satisfy. Of course, there's the other part of the accommodation or just the district screen-out claim, which is just forget about the lenses. This test was not a good test because it just didn't reflect what he, in fact, needs to say. But can't you make that second claim in an FRA administrative proceeding? I take your point that maybe you have some issues that you, you know, if you want to make ADA-specific accommodation claims, let me just give you, for the sake of discussion, that those would be difficult to raise in an FRA administrative appeal. Certainly, this is a bad test. The field test was procedurally flawed. It doesn't actually reflect the reality of operating a train. That has to be the heartland of the FRA appeal. You know, my best answer is I don't think they could remedy that. So there's two reasons why. First of all, that modification to the exam could also be a reasonable accommodation. This Court's decision in Null addresses that. The Eighth Circuit most recently in Sanders v. Union Pacific, which we said in our reply, does a nice job of addressing this. But I think more to the point, that point is also from the subregulatory materials. This idea that the test needs to be reflective of what the trainman actually sees is not in the regulation itself. And so, you know, you're putting me a little bit between a rock and a hard place here, but my best, most honest answer is I don't think the FRA could reach that point. It's a very circumspect review process, as we've made clear in the briefs. I want to talk briefly, if I can. I know I'll leave time for my amicus support and my rebuttal about the qualified question. Given that I have a minute left, I'm just going to share with the Court what I see as the essential inquiry, right? If you have a case, and this is like Albertson and like Williams, where the government imposes a clear, objective standard without any discretion, then we all agree an employee has to be able to meet that standard, and if he can't, he's not qualified. I hope we can all agree that on the opposite end of the spectrum, if there's no regulation whatsoever, and it's simply a test that the employer made up out of whole cloth, that that's going to be subject to review under the ADA. What we have here is the case in the middle, right, where you have a broad regulatory structure that gives an employer a ton of leeway to craft its own test, and the answer here is, as long as it is the employer's test, and as long as the employee is suggesting an alternative that would also comply with the regulations, that the company has to comply with both, and ultimately that's going to be decided at summary judgment and at trial, according to the doctrinal structures of the ADA. Unless the Court has any further questions, I will rest until my rebuttal. All right. Thank you. Thank you, counsel. Ms. Yeomans? Yeomans. You may proceed. Thank you, Your Honor. Ms. Georgina Yeomans for the Equal Employment Opportunity Commission, as amicus. We weighed in on two issues in this case, preclusion and whether Mr. Turner's failure of the secondary test renders him unqualified as a matter of law under the ADA. Our argument that the district court wrongly held that his case was barred on those two bases rests on five premises that I think, once established, make this case relatively straightforward. The first premise is that the FRA has recognized that there is a group of individuals who are color vision deficient on the basis of a primary test, but who can nonetheless perform the job of conductor or engineer in a safe manner, and has tasked the railway companies with crafting a secondary test to determine who those individuals are. I want to be very clear that that secondary test is not a screen-in test, as BNSF argues. It is a mandatory part of the certification process, and we see that at 49 CFR 242.117J, which uses the term, quote-unquote, untitled. Employees are entitled to a secondary test without making any further showing. The second premise is that the FRA has granted discretion to the railroad companies in crafting that secondary test, but that discretion is confined by the application of other federal law, including the ADA, and we know that from the POM wonderful analysis that we set forth in our brief. The third premise is that Turner has brought an ADA challenge to BNSF's secondary testing protocol, not simply a challenge to whether or not the testing protocol complies with the FRA regulations. He's alleged that the test needlessly discriminates against people on the basis of disability and is not job-related and consistent with business necessity because it does not accurately test what people need to see in the field in order to safely perform their job. That is a quintessential ADA claim. The fourth premise is that the FRA could not have resolved this claim in the administrative review process, and to get to one of the questions earlier, I think that that's particularly true given the OCRB decisions that BNSF cited in its brief. It's very clear that the OCRB views its province as determining whether there was a factual error in the determination that the individual failed the secondary test and whether there was any prejudicial procedural error in the administration of the test. None of those opinions go to a de novo review of the efficacy of the secondary test itself, and certainly they do not go to whether the test complies with the ADA. Our fifth and final premise is that failing an allegedly discriminatory qualification standard does not render one unqualified as a matter of law, as the BASE decision and the Roar decisions from the Ninth Circuit illustrate. This is not a case like Albertson's, where the employer is relying on a mandatory federal standard. I think perhaps this case would be like Albertson's if the FRA had determined that people with color vision deficiencies simply cannot do the job safely and had made the primary test a necessary component of certification, or a required component of certification. Then this would be a case like Albertson's. But the FRA did not do that and instead recognized that there's a group of people who can nonetheless do the job and have left it to the employers to craft a test that best gets to that question. But on that last point, the way I took the FRA's position was there are some people who can drive trains without being able to see color, but it's because they're either driving trains in the so-called, I'm forgetting the phrase, dark out or black out sections, or they're doing it in a place where they don't need to see signals. So if you're driving a train in a place where you need to be able to see signals, obviously you need to know if it's red or green. That has to be a mandatory obligation. The regulations do not make that distinction. So if you look at 242.117, which contains the vision standards and section J in particular, which delineates the secondary testing protocol, it's not limited to circumstances in which people do not need to be able to discern colors. It says there's a mandatory entitlement to a secondary test that can take the form of, for instance, a field test, which is what BNSF has chosen to use in this instance, and that it's supposed to determine who can actually perform the job safely, notwithstanding their inability to pass something like the Ishihara test. Does the United States have a position on the chromatic lenses question? I mean, the way I read the FRA's guidance in best practices, it specifically tells the railroad not to, prohibits them from using it for initial tests, and then all but directs them not to use these lenses for whatever you call them, the retests, the three-year retests. We have not taken a position on whether Mr. Turner should have been allowed to use the lenses during his testing or during his operation of a train. I think that is perhaps an issue for later on in the case when in the assessment of reasonable accommodation. Unless the court has any further questions, I thank you for your time. Thank you, counsel. Mr. Neal? Yes. Good afternoon. May it please the court. Brian Neal for BNSF Railway Company. Freight rail transportation safety has a longstanding high priority in this nation. It's critical that the employees who are doing that work are able to do so in compliance with the medical standards that are established, and the disputes about that, including about vision acuity, are resolved according to the regulatory process. This lawsuit seeks to take that determination of whether Mr. Turner was entitled to a certification or not out of that process set up by the statutory and the regulatory delegations and structure, out of that process, and place it into case-by-case determinations across the country that would occur in ADA lawsuits. That approach is inconsistent with the statutory and regulatory structure, and it also overlooks the principle that the Supreme Court recognized early on with respect to the ADA, that federal safety rules will limit the application of the ADA as a matter of law. The district court here applied that principle on two related but independent grounds as far as the preclusion and this court's decision in Williams going to the qualified individual point this court should affirm. I want to start by talking about a couple of disagreements we have on the framing of the issues in the case. I want to talk about the qualified individual point. You said you were going to get to that. Do you mind starting with that one? Sure, sure. That's actually the first substantive point I was going to start with. I just want to make sure I understand the district court's ruling because it appeared to me that the district court was saying he's not qualified because he didn't get the certification. He's not qualified, and you've got to be qualified in order to maintain an ADA claim. He's not qualified by virtue of not getting the certification. That was the basis of the district court's ruling. That's right, and it follows this court's ruling in Williams. My first point to you is going to be, to the panel, is going to be that I can get to the preclusion point momentarily, but the most straightforward way to affirm the district court's ruling is to apply the Williams rule. I read the ADA to say you're qualified to do a job if you are capable of doing it or you're capable of doing it with some accommodation. Either you're qualified, you can do it, you can perform the job, or with some accommodation, you can perform the job. That makes you qualified. The district court seemed to be saying you're disqualified from maintaining an ADA claim because you were denied the certification. His contention, of course, is I was denied the certification because they gave me a test that doesn't relate to what it is I'm doing. Right. Two things about that. There are two requirements to be qualified. The one that the court runs into most often is the one you're talking about, Judge Graves, that you've got to be . . . You're capable of doing the job. The second one is you have to have whatever licensing or certification or other requirements there are to do the job that's established either by the employer or, in this case, established by the federal government, which is you have to have that certification. But if that defeats your ability to maintain an ADA claim, then by virtue of being denied certification, the employer can render you unqualified for the job. That can't be right. It is, and this court's decision in Williams covers this situation exactly. I guess it can't be right. It can't be right in terms of maintaining an ADA claim. It is, Your Honor, and that's because . . . So start with the ADA. You've got to be qualified. Qualified has those two elements, one of which is to have the certification. Here we have the issue that comes up of what happens if an employee doesn't have a certification. In Williams, the court said this employee does not have a certification. There's a dispute about whether he should have a certification because you've got two different doctors disputing whether the employee met the standard to get a certification. Because that employee didn't use the process that was available under the regulations to resolve that dispute, this court said that employee was not qualified as a matter of law. End of story. That's exactly the situation here, even though the regulatory standards are different because you've got motor vehicle certification on the one hand, which is different than rail certification because any doctor can sign up to give a certification. So he's disqualified here because he didn't follow a process? Exhaustion of an administrative remedy? The combination. He didn't get a certification and he didn't challenge that denial of certification through the regulatory process. The exact same thing that the court said in Williams. The certification challenge here, the appeal is available if the employee believes that the certification was incorrectly denied. That's exactly what we have here. Now they want to go drill down deeper and point to some reasons why they say it was incorrectly denied, and those actually set up direct conflicts with the ADA. I'm sorry, between the ADA and the regulatory structure. But the appeal is available exactly for this situation. Employee seeks a certification, doesn't get it, believes that the employer incorrectly denied that certification. That's when that appeal right kicks in. Same thing in Williams, except what triggers that appeal right was the disagreement about, number one, whether an employee had a particular medical condition that was covered by the DOT rules, and number two, whether the medical examiners agreed or not as to whether that rendered the employee unsafe. In both cases, you have the regulatory situation triggering the appeal right. This court said in Williams when that appeal right is triggered and the employee doesn't have it . . . I think I understand Williams. I just think it's being misapplied to these facts. This district judge seemed to be saying you can't bring an ADA claim because you're not qualified, and you're not qualified because you didn't get your certification. And Turner maintains I didn't get my certification because of this test you gave me. Well, that's right. Well, let me actually . . . So you can deny a certification and now I can't bring an ADA claim because you denied my certification. Well, because he didn't choose to use the regulatory process available to him to challenge that denial. You may proceed. Exactly what the court said in Williams. Let me back up one minute and try to convince you of one thing, Judge Graves. This situation differs from the normal ADA situation where an employer has adopted a standard along the lines of we don't hire anybody who doesn't have 20-20 vision, or we don't hire you if you can't distinguish colors, or we don't hire you if you can't lift 50 pounds and carry it 100 yards, whatever the employer requirement is. This one is different because step one here, we have a regulatory requirement that the employee has to have the certification. And then the test to determine that, the first test is the prescribed required test by the FRA. Once the employee fails that test, they're behind the eight ball. They're essentially disqualified unless they can come back to it. And so the other side in the EEOC wants to treat this like it's just an ordinary employer qualification standard, but it's not because this employee has already failed the initial test. We're entirely in the exception world now. It's all about exceptions to that initial assessment that the employee failed. Counsel, what do you make of the argument that both of your friends on the other side have made, which is that this administrative appeal under the FRA is meaningless because it's just in relevant part, because it's just checking procedures. There's no way to raise the claim that the test itself is flawed or that the test itself violates the ADA. They're just entirely wrong about that. You can see that from the board decisions that we provided. No, you can't go to the operating board and say my employer discriminated against me under the ADA. They're going to say, no, that's not within our purview. And that's where the word discrimination comes in, and we have to look behind that conclusory term and see what is it he's saying that was the discrimination. Do you have OSB cases where the employee says the test is a bad test? Like here's my evidence. They gave me this test that has no bearing to reality. It's just a bad test. The reason I failed it is because it's not actually measuring anything. It's just, you know, it's some random person, you know, dinging me behind the Wizard of Oz veil. Yeah, I think that the decisions we cited in our brief, I don't have the sites off the top of my head, go to that point. Now, they're not usually that broad of just saying they're usually picking out one or two problems. But you can challenge the veracity of the test. Like you can say the test is substantively a bad test. Sure, sure. You can say, and remember, the ultimate standard here is you're appealing because you're saying the employer got the certification decision wrong. And then they're going to go and say why that is. Well, because they gave me a secondary test that didn't measure what I have to do on the job. Because the best practices document says the test has to reasonably match what is done on the job. And that's why when you look at their claim and how they actually described it in the complaint, not the broader view that they're trying to take on appeal here, it is clear that they are challenging the nature of that secondary test. What of the EEOC's position that in fact you don't actually have to be able to see color to be a train conductor? I'm sorry? The EEOC says this isn't actually a mandatory requirement. It's some sort of lesser or secondary thing, which takes us into a different doctrinal box because in fact you don't actually have to be able to see color to drive a train. No, that's incorrect. It gets back to the point I was making a moment ago that the initial test has been failed. You have to have the certification. So we're all in exception world here. That exception is exceedingly narrow to come back from that. And we talk about this in our brief and the other side doesn't really ever engage on it. The exception is you can have further review by the medical examiner, who the FRA has delegated to make these decisions. And then if that employee, and only if that employee convinces that medical examiner that despite failing the government-mandated test, he or she can work safely in this job, that's the exception. And so it's a very narrow exception. When they try to apply the ADA to that, it flips the standard and it flips the burden because they want to say, no, no, employer, you got to design the secondary test, and so that's something where you have to show it's a business necessity under the ADA, even though the regulation clearly says the only way to come back from that initial failure is not to convince a judge or jury that you should have gotten a medical certification, but that you've convinced that medical examiner, who this power has been delegated to, that you were safe to work. And if you don't do that, your one more out is to appeal it to the FRA and convince the FRA that the medical examiner got it wrong. And that can be for any number of reasons that you want to raise. I guess I can account for the fact that he did the job for fifteen years. If I conclude that his vision changed between the time of the last test that he passed and the most recent test. But other than that, is there some way to account for the fact that he actually did the job for fifteen years? Well, no. I mean, first off, the time period's wrong because the certification standards didn't go into effect until about 2015, and so the period isn't right here. So how many years did he do the job without having passed the test? Sorry? He took some tests at some point before this one. Yeah, he did. And he passed it. He did. Okay, how long ago? I think there was one, but that's not set out in the record. It went into effect, and then there was a three-year waiting period, and then he would have had one test, and this, I think, would have been his second test. Did he take it with his glasses? No, no. No class one railroad allows . . . and this isn't in the record, Judge Oldham, but no class one railroad allows an employee to use these chromatic lenses for the reasons you've talked about. And the critical one, and this is why . . . that's really a distraction. It's not an ADA accommodation as a matter of law because you can't use them while you're working. So it's not an ADA accommodation to say, I'm doing this test to see if I can safely work. Let me do something that I can't do while I'm actually working. What is the . . . I'm sympathetic to this because this is my understanding as well, but is there a legal requirement? Is it an FRA reg, or is there some statutory thing that prohibits you from . . . The best practices document. It's in the same document. Right, right. In that paragraph discussing the chromatic lenses, it indicates that the employee can't wear those chromatic lenses, and that's, frankly, because they don't work. I mean, they can help, but they don't work to a degree that the FRA was comfortable saying that, and that was why they quoted the FDA information about those types of glasses. Just one more point on the standard here, and this process that is really critical and is what distinguishes it from the ordinary ADA case where you've got an employer qualification standard and the employer has to come in and justify that. It's in 242.117J. That's the entirety of the regulation for the secondary evaluation process or this exception assessment process that is at issue here. The employee is entitled to this further evaluation if . . . I'm jumping over some words here, but if the medical examiner concludes that despite not meeting the thresholds, and that's referring back to that specific scientific test, that the individual has the ability to perform safely, the medical examiner can go ahead and issue a certification, but only if that medical examiner actually concludes the employee can work safe, not if the plaintiff goes in and convinces the jury, like in the normal direct threat or business necessity type of a case, that I'm safe notwithstanding what that railroad medical examiner said. That's the authority that was delegated to medical examiners for railroads because of the unique nature of railroads as opposed to motor vehicle transportation where any doctor can sign up and do this job. It's subject to review by the FRA on the basis for the appeal, which is, did the employer get it right? Is the decision correct or incorrect? At bottom, that's what they're challenging here. They're not saying, oh, I really passed the test and you didn't certify me. They're saying, I failed the test, but I shouldn't have. The decision on certification was incorrect. Getting back to the Williams case, that case really is on point with this one. In both cases, you had a dispute about a certification that triggered the appeal process. This court said, having not taken advantage of that appeal process, you're not qualified as a matter of law. In the Eighth Circuit decision in Harris, said the same thing. The easiest way for the court to affirm here is to simply apply the Williams case to the, yes, different situation of rail versus motor vehicle, but the same scenario where the appeal right has been triggered and not used. It's undisputed, of course, the employee doesn't actually have certification. The other side distinguishes that or tries to challenge that point by saying, well, the standard under DOT is a specific governmental standard. You can't have X, Y, Z condition. That's not exactly right. It's that you can't have X condition and you have to have a medical certification that you've done it right. You've got the same scenario of medical judgment being applied and there being a disagreement there, which comes up in ADA cases all the time. A lot of times they're litigated under the direct threat standard where the burdens are different. Here, just as in Williams, the availability of that process to resolve that dispute means that the individual is not qualified. Moreover, there is a specific governmental standard here. It's that the individual has to, number one, have a certification, and number two, that involves vision acuity testing. I'll just say a few words about the preclusion point before we finish up. On the preclusion point, Your Honor, the POM Wonderful does not apply to this case. POM Wonderful is not the be-all, end-all of preclusion. And there are different types of preclusion. We use that word, even though it's not really a term of art. It means different things. We could have said bars the claim, limits the claim, or limits as a matter of law. The kind of preclusion we're talking about is the analogy to the Railway Labor Act that, until today, I don't think the other side has ever actually responded to. It's the idea that the decision-making is committed to another body. So under the Railway Labor Act, you've got construction of the agreement is committed to another body, the arbitration boards. When you have a discrimination claim, and the Court's hearing an argument on this same issue, I think, in a little while, when you have a discrimination claim that turns on resolution of that issue, in that instance, the claim is precluded by the Railway Labor Act. And I'll note in that case, the United Airlines case coming up, neither party nor the EEOC, even appearing as amicus in that case, even cited Palm Wonderful, much less said, oh, we can't have preclusion here because of the Palm Wonderful case. That's because Palm Wonderful doesn't have anything to do with this case. That was a simple case of two side-by-side statutes where the Court said it rejected the argument that because one is more specific, you can only sue on the other. Just like if I came in as an employment lawyer and said, an employee can't have a Section 1981 race discrimination claim because Title VII is more specific to employment. Nobody would accept that argument. That's not the right argument. But it has nothing to do with the kind of preclusion that we're arguing here, which is that assignment to another body of the decision-making that has to be conducted that dictates the outcome of the case. The final word I'll bring up is just to come back to that standard and point out how applying the ADA would directly conflict with the standard that the agency set in the provision that I read a moment ago because it flips the burden of proof from employer's medical examiner has to decide you're safe to employer has to come in and prove that the test applied or the qualification standard applied actually was a business necessity under the agreement or perhaps that the employee is a direct threat. Either of those is a direct contradiction to the regulatory term. So we've got a classic case here where the ADA claim that they're making conflicts directly with the regulation, both on what the standard is as well as who the decision-maker is. So whether you look at it as a Williams case, not qualified, or you look at it as a preclusion or a barge case, the judge got it right here, the claim cannot go forward. Thank you, counsel. Roboto. I want to take any questions, of course, but leave the court with three final points. The first is whether BNSF's argument is framed through the lens of preclusion or through the qualified standard under the ADA. Their arguments amount to a stark claim of authority that Congress did not give them, and I think it's very important for this court to police those lines. The essential holding that BNSF would have this court right is that any time a body that regulates gives a private entity a field of operation or an amount of discretion, that anything that the regulated entity does, as long as it's somehow consistent with that regulation, is simply good enough when transposed over to the ADA. If you take that argument to its logical conclusion, you could imagine a regulation that just says, do this test, Railroad. We don't care what the substance of it is. All we care is that you do it. Of course, that would not be reviewable by the agency, and whatever the Railroad decided to do on that test would be considered unreviewable, both within the administrative forum and, of course, in court under the ADA. That's not the law. Whether it's POM Wonderful or whether it's qualified, the court has to give effect to both laws. And I would just suggest, think about how much more modest, in addition to, we think, correct, the rule of law that we would ask this court to write is. We are simply saying, of course, you cannot do anything, Mr. Turner cannot do anything that's inconsistent with these safety regulations. The only thing we add to that is that the ADA may constrain, in this case does constrain, the Railroad's vast discretion that it otherwise has here. It might have a menu of ten choices when simply framed through the FRA regulations, but those may be reduced to five or six choices when the ADA is brought into the picture. There's no conflict between the two laws. They fit hand-in-glove together. That's the rule that Congress would want the court to follow. The second point I wanted to make is that whether Mr. Turner is qualified is, of course, upstream from the certification decision. And, I mean, it's not enough to simply say, well, Mr. Turner didn't get a certification, therefore he's unqualified. We're not... I mean, Williams didn't do this, right? Williams said, well, I think I'm qualified anyways for the following several reasons, and that was not a good argument to make. Of course, here the argument is the only reason that Mr. Turner was disqualified was this test that you... that, I beg your pardon, BNSF devised. And but for that test, he could have been both qualified and recertified. And what's more, the test he proposes is, of course, perfectly consistent with the FRA regulations. The last thing I want to leave the court with is this, I think, just reaffirming the discussion that although ultimately it doesn't matter, I don't think that there would have been any recourse for Mr. Turner at the FRA in the appeals process. As I'm looking at the review language, it's very heavily circumscribed. It just deals with, essentially, substantial evidence on the facts. There's no dispute about the facts here. Procedural error, that's not applicable. And whether the railroad's legal interpretations of the regulations are correct. It's hard for me to see how the FRA's legal interpretation of the regulations would be problematic here, because the regulations provide no substantive guidance whatsoever about how to conduct a field test. The only place you get that is from the sub-regulatory materials. But that's not going to be a grounds for reversing under the FRA appeals process. But ultimately, it doesn't matter. If a hypothetical Mr. Turner had gone and appealed and won or lost, it wouldn't affect his ability to maintain a claim under the ADA. And I would point the court to the decisions from the FRA board that we cite at page 21 of our reply. The FRA crew board or the FRA administrator has no authority to enforce the ADA. Congress didn't give them that authority. They have no authority to order a reasonable accommodation, as the ADA may require, and in fact, in this case, did require. Unless the court has any further questions, I would ask the court to reverse the district court's judgment and remand for further proceedings. All right, thank you, counsel. The court will take this matter under advisement. Our next case is cause number 24-10439.